**MISSOURI PACIFIC RAILROAD COM-
PANY, Appellant,**

v.

**WINBURN TILE MANUFACTURING
COMPANY, Appellee.**

**No. 71–1194.**

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 16, 1971.

Decided June 6, 1972.

Robert V. Light, Little Rock, Ark., William J. Smith, Little Rock, Ark., of counsel, for appellant.

James D. Storey, Wright, Lindsey & Jennings, Little Rock, Ark., for appellee.

Before GIBSON and HEANEY, Circuit Judges, and VAN PELT, Senior District Judge.*

VAN PELT, Senior District Judge.

This action was brought by the Missouri Pacific Railroad Company to recover from the Winburn Tile Company amounts paid an injured railroad switchman, Carl Randell Breece, under the Federal Employers' Liability Act. The case was tried to a jury, which found that both of the parties were negligent; that such negligence was the proximate cause of the employee's injuries; that the railroad had acquiesced in the tile company's negligence; that the settlement made by the railroad with the injured employee was reasonable, prudent, and in good faith; and that the railroad had incurred $1,272.55 in reasonable expenses in handling the injured employee's claim. The trial court, based on the jury findings, determined that the defendant should only pay 50% of the amounts paid by the railroad to Breece. The railroad appeals.

---

* Senior District Judge for the District of Nebraska sitting by designation.

Pursuant to Rule 10(d) of the Federal Rules of Appellate Procedure, the parties have filed an agreed statement of the case which establishes the facts hereinafter set forth.

Winburn Tile established its business near the tracks of the Missouri Pacific Railroad in the late 1950's. The tile company's premises had previously been served by a sidetrack of the railroad, and both parties wished to continue this relationship. The tile company's premises were fenced and the sidetrack was crossed by a metal gate which was kept locked. Railroad personnel had keys and they opened and closed the gate on each occasion when it was necessary for switch engines and freight cars to enter or leave the premises.

Pursuant to this arrangement, the parties executed an "Industrial Track Agreement" in 1960, providing service to the tile company from this sidetrack. The agreement also contained three indemnification provisions, two of which are apparently standard forms and were a part of a printed form, while the third was typewritten. This typewritten clause dealt specifically with the gates.

The three indemnification provisions are:

1. Paragraph 3 in which the tile company agreed to maintain certain clearances in connection with the spur track:

"Shipper assumes full responsibility for, and shall defend, indemnify and save harmless the Carrier from and against, any and all liability, suits, claims, damages, costs (including attorneys' fees), losses, outlays, and expenses in any manner caused by, arising out of or connected with the failure or refusal of Shipper to comply with, observe or perform any of the provisions of this covenant, notwithstanding any possible negligence (whether sole, concurrent or otherwise) on the part of Carrier, its agents or employees."

2. Paragraph 4, which reads:

"It is understood that movement of railroad locomotives involves some risk of fire and, unless solely caused by the negligence of Carrier—which Shipper shall have the burden of proving, Shipper assumes all responsibility for and agrees to indemnify Carrier against loss or damage to property of Shipper or to property upon Shipper's premises arising from fire caused by locomotives operated by Carrier on Switch, or in its vicinity, for purpose of serving Shipper or Shipper's tenant, if any, except to premises of Carrier and to rolling stock belonging to Carrier or to others and to shipments in course of transportation. Shipper also agrees to indemnify and hold harmless Carrier for loss, damage or injury from any act or omission of shipper, Shipper's employes or agents, to the person or property of the parties hereto and their employes and to the person or property of any other person or corporation, while on or about Switch; and, *except as otherwise provided in this agreement,* if any claim or liability shall arise from joint or concurring negligence of both parties hereto, it shall be borne by them equally." (Emphasis supplied.)

3. The unnumbered, typewritten paragraph, pertaining to the gates, which states:

"Shipper, at Shipper's sole cost and responsibility, shall have the right to erect, keep and maintain as part of Shipper's fence enclosing Shipper's premises, metal gates and appurtenances, hereinafter, collectively, called 'Gates' over and across Switch approximately where indicated by brown line on Exhibit 'A'. Gates shall conform substantially to cross section sketch shown on Exhibit 'A' and be of design and construction satisfactory to Carrier's Division Superintendent. Shipper, at Shipper's cost, shall maintain Gates in a good and safe condition. Shipper shall provide and keep as part of Gates suitable appliances for fastening same when open so that no part thereof shall be nearer than 9 feet horizontally from the center line of Switch, and, as well, suitable appliances for fastening Gates when closed.

Gates shall be equipped with switch lock, to be furnished by Carrier, so that Carrier's employes may open and close Gates incident to the operation of locomotives and cars over Switch. *Shipper assumes fully responsibility for, and shall defend, indemnify and save harmless the Carrier from and against any and all liability, suits, claims, damages, costs (including attorneys' fees), losses, outlays and expenses in any manner caused by, arising out of or connected with the installation, construction, operation, maintenance, use or existence of Gates or any part thereof, except such loss and damage or claims which may arise from the sole negligence of Carrier, its agents, servents [sic], or employes."* (Emphasis supplied.)

Following execution of this agreement, the railroad provided industrial switching service to the tile company. On August 5, 1968, one of the railroad switch crews opened the gates for the purpose of delivering or picking up freight cars on the spur. Railroad employee Breece, a switchman, rode into the plant on the side of a car or locomotive, performed his work within the tile plant premises, and was in the process of riding out of the plant on the right side of a freight car when he was struck in the back by the gate section nearest the plant building. This caused him to fall to the ground and sustain severe personal injuries. Breece later settled his claim with the railroad for $26,545.-00.

Investigation revealed that the gate had been permitted to swing back toward the track and into a position where it hit Breece in the back because of the absence or inoperative condition of the appliances used to secure the gates while in an open position, or because of vegetation which prevented moving the gates to a full open position, or because of the failure of a railroad employee to prop the gate open by use of a rock or other object, or by concurrence of one or more of these conditions. These conditions had existed for a long period of time.[1] There was no evidence that the tile company employees had occasion to unlock the gates. There was no evidence that the railroad employees had ever brought these conditions to the attention of their railroad superiors.

The railroad made demand on the tile company for the $26,545.00 paid to Breece, but the title company consistently refused to pay. Thereafter, the railroad company commenced this suit, which went to trial with the results above set forth. Because of the jury's findings, the trial judge, pursuant to paragraph 4 of the agreement, quoted above, awarded the plaintiff only 50% of the settlement expenses and entered judgment for $13,848.78. We reverse.

Under Arkansas law, a contract which indemnifies a party against his own negligence is not contrary to public policy. Pickens-Bond Const. Co. v. North Little Rock Elec. Co., 249 Ark. 389, 402, 459 S.W.2d 549, 557 (1970); Hardeman v. J. I. Hass Co., 246 Ark. 559, 439 S.W.2d 281 (1969); Ross v. Smith, 315 F.Supp. 1064 (E.D.Ark. 1970). It is our determination that the unnumbered, typewritten provision of the contract in question here requires that the defendant tile company be held liable for all sums paid by the railroad to the injured employee. The typewritten provision dealt *specifically* with the gates. Defendant's conduct was in direct violation of the provision. The other two provisions quoted above only dealt generally with the situation presented. Under Arkansas law, if there is an inconsistency between general and specific provisions of a contract, the specific provisions ordinarily qualify the meaning of the general provisions. Pate v. Goyne, 212 Ark. 51, 204 S.W.2d 900 (1947); English v. Shelby, 116 Ark.

1. Two railroad switchmen testified at trial that they had known of the high vegetation around the gate fasteners and that the fasteners had been in an inoperative condition for years, but they knew of no one who had ever reported these facts to either the railroad or the tile company.

212, 172 S.W. 817 (1915); United States v. R. D. Wilmans & Sons, 147 F. Supp. 232, 238 (E.D.Ark.1956), aff'd, 251 F.2d 509 (8th Cir. 1958); Restatement of Contracts § 236(c) (1932). The fact that the provision pertaining to the gates is typewritten, while the other clauses are from a printed form, also merits some consideration. McKinnon v. So. Farm Bureau Casualty Ins. Co., 232 Ark. 282, 335 S.W.2d 709, 710 (1960). In addition, paragraph 4 of the agreement, under which the trial court made its determination of the 50-50 split, contained the limiting language "except as otherwise provided in this agreement."

■■ While it is true that an indemnification provision must be clear and unequivocal in order to be upheld, Hardeman v. J. I. Hass Co., *supra*, 246 Ark. at 562, 439 S.W.2d at 285, we believe the provision here clearly sets forth the tile company's duty. Under the typewritten clause, the tile company assumed "full responsibility for . . . any and all liability . . . caused by . . . the . . . installation, construction, operation, maintenance, use or existence of Gates or any part thereof . . . ." The negligent conduct which resulted in the injuries to switchman Breece is specifically covered by this language. The *only* exception to this provision is a claim "which may arise from the sole negligence" of the railroad. The jury's determination that the accident was caused by the negligence of *both* parties precludes any finding that the railroad was solely negligent.

In this regard, we also point out that the trial court properly submitted the issue of the railroad's negligence to the jury. Two of the railroad crewmen testified that the gates' condition had been known to them for many years. No report to the railroad superiors had apparently ever been made of the condition. One of the crewmen stated that it was not their responsibility to make such a report. However, he also stated:

"A. Well, yes, sir, if we see something that is dangerous, why, we usually make a report of it.

Q. So then you didn't consider this to be dangerous or you would have reported it?

A. It wasn't dangerous so long as no one got hurt on it." (T. pp. 113–114)

■ The train crews were responsible for opening and closing the gates when the train entered the tile company's yards. Under Arkansas law, an employer is charged with knowledge acquired by his employee in the course of his duties and in circumstances in which the knowledge should have been reported to the master. Hignight v. Blevins Implement Co., 220 Ark. 399, 247 S.W.2d 996 (1952). The employees' testimony at trial establishes that they knew of the defect for many years prior to the accident which caused the switchman's injuries here. The length of time a defect has existed is an important factor in determining whether or not the employer, in the exercise of ordinary and reasonable care, ought to have known of the defect. The fact that the employees were not in charge of repairs does not necessarily settle the question since it was admitted that they did make reports on something that was "dangerous." Under the facts presented, we believe that a jury properly could find that the railroad knew or should have known of the gates' condition which caused the switchman's injuries.

■ In holding that paragraph 4 of the agreement required that the defendant pay only 50% of the damages sustained by the injured employee, the trial court failed to give effect to the contract provision which expressly pertained to the gates. Thus the court failed to apply the Arkansas rule of contract construction that it is error to give effect to one clause over another clause, if the clauses can be construed together. As stated by the Arkansas Supreme Court in Continental Casualty Co. v. Davidson, 250 Ark. 35, 463 S.W.2d 652, 655 (1971):

"In construing a contract, . . . we must assume that the use of different language to define different

obligations was deliberate and accompanied by an intention to convey different meanings rather than the same one. Different clauses of a contract must be read together and the contract construed so that all of its parts harmonize, if that is at all possible, and, giving effect to one clause to the exclusion of another on the same subject where the two are reconcilable, is error. . . . A construction which neutralizes any provision of a contract should never be adopted if the contract can be construed to give effect to all provisions." (Citations omitted.)

Unlike the trial court, we are not persuaded that this court's decision in Missouri Pac. R. R. v. Arkansas Oak Flooring, 434 F.2d 575 (8th Cir. 1970), requires application of paragraph 4, quoted above, in contravention of the typewritten provision. In *Oak Flooring*, the court distinguished an earlier decision under Arkansas law, Anthony v. Louisiana & Arkansas Ry., 316 F.2d 858 (8th Cir. 1963), which had held the defendant liable under the broad indemnity language of the parties' contract. The *Oak Flooring* court pointed out that the contract in *Anthony* contained a "non-waiver" clause which stated that the railroad's knowledge of the negligence in question was not a waiver of the indemnity covenant, while the contract in *Oak Flooring* contained no such non-waiver provision. However, in the case here, the indemnifying language found in the typewritten paragraph is so unambiguous as to leave no doubt of the parties' intent. Clearly, the only way the tile company was not responsible for negligence in the use of the gates was if that negligence was *solely* that of the railroad. The *only* way the railroad might have "waived" the benefits of the provisions was if it were solely negligent, a situation not presented by the facts here.

We do not believe that the defense of acquiescence prevents the railroad's obtaining full recovery in this instance. While acquiescence is a widely recognized defense to full indemnity,[2] the indemnitee's fault must be serious enough and sufficiently distinct from that of the indemnitor before the defense applies. Pennsylvania R. R. v. Erie Avenue Warehouse Co., 302 F.2d 843, 849 (3d Cir. 1962). *Cf.* Chicago Great Western Ry. v. Casura, 234 F.2d 441, 449 (8th Cir. 1956). The railroad's acquiescence in the tile company's negligence was not sufficiently distinct from either its own negligence or that of the tile company's to warrant application of the acquiescence defense. The strong typewritten indemnification provision in the parties' contract supports this position. *Cf.* Anthony v. Louisiana & Arkansas Ry., *supra,* 316 F.2d at 865. Upon the jury's verdict that the railroad was not solely negligent for the employee's injuries, the trial court should have entered a judgment for the full amount of the settlement and the railroad's reasonable expense in handling the claim.

The railroad contends that it should have been allowed attorneys' fees in the lower court. The typed provision of the contract does provide for attorneys' fees. Apart from any statutory enactment to the contrary, it is the general rule that a provision in a contract for attorneys' fees is valid. *See* 17 A.L.R.2d 290, § 2; 17 Am.Jur.2nd Contracts § 164. However, Arkansas took the position in 1883 that a provision for attorneys' fees in a promissory note was a penalty and therefore in violation of public policy. Boozer v. Anderson, 42 Ark. 167 (1883). This rule was applied by later Arkansas decisions.[3] However, in 1951, the Arkansas Legislature passed a law upholding attorneys' fee provisions in promissory notes, so long as the fee did not exceed 10% of the amount of

2. *See, e. g.,* Missouri Pac. R.R. v. Arkansas Oak Flooring, *supra,* 434 F.2d at 578–579.

3. Jarvis v. Southern Grocery Co., 63 Ark. 225, 38 S.W. 148, 149 (1896) (mortgage);

Bank of Holly Grove v. Sudbury, 121 Ark. 59, 180 S.W. 470, 471 (1915) (note); Federal Land Bank of St. Louis v. Craig, 176 Ark. 381, 3 S.W.2d 34, 36 (1928) (mortgage); American Exchange Trust Co. v. Trumann Special School

**990**

the principal due plus accrued interest. Ark.Stat.Ann. § 68–910 (1957 Replacement Volume). While it is not entirely clear, the Arkansas prohibition against such fees in promissory notes and mortgages is apparently applicable to contracts in general. *See* Note, Taxability of Attorneys' Fees as Costs, 9 Ark.L. Rev. 70–72 (1955). Since the 1951 legislative change only applied to promissory notes, National Bank of Eastern Arkansas v. Blankenship, 177 F.Supp. 667, 678 (E.D. Ark.1959), aff'd, 283 F.2d 574 (8th Cir. 1960); Meek, Secured Transactions Under the Uniform Commercial Code, 18 Ark. L. Rev. 30, 77–78 (1965), the Arkansas court's previous condemnation of such contract provisions must be honored. *Cf.* McDearmon v. Gordon & Gremillion, 247 Ark. 318, 325–32, 445 S.W.2d 488, 492–96 (1969) (contingent fee in a contract involving a divorce action held to be in violation of public policy). The trial court's disallowance of such attorneys' fees was correct.

The judgment appealed from is reversed and the case remanded with directions to enter judgment for the plaintiff consistent with this opinion.

Dist., 183 Ark. 1041, 40 S.W.2d 770, 772 (1931) (deed of trust). *But cf.* Selle v. Fayetteville, 207 Ark. 966, 975, 184 S.W.2d 58, 63 (1944).